## MURPHY v. THE STATE, 28 Miss. Rep., 637.

### TRADING WITH SLAVES.

Although it has been held[1] that sec. 2 of the act[2] prohibiting trade and barter with slaves, which dispensed with the averment and proof of the kind of produce or commodity bought or sold, is invalid under sec. 2 of the bill of rights, yet, an indictment under this statute containing the necessary averments, is valid, and should be sustained.

As a general rule, in civil as well as criminal cases, a person who is interested in the event of a suit or prosecution, is incompetent as a witness. But where the statute gives a reward for the conviction of offenders, or the witness as informer is entitled to a part of the fine imposed by statute on the accused; on the grounds of

[1] Murphy v. State, 24 Miss. R., 590.          [2] Act of March 6th, 1850.

public policy, and for the purpose of bringing offenders to justice, such interested person is a competent witness in behalf of the prosecution. FISHER, J., *dissenting.*

As a general rule, every material averment in the indictment must be proved; but it is unnecessary to prove the offense to the whole extent charged. It is sufficient to prove so much of the indictment as to show that the accused has committed the offense charged.

The jury was instructed that "if the slave came out with spirituous liquor which he did not take into defendant's house, the defendant's knowledge is presumed; *Held,* that the instruction was correct.

The identity of the slave nor his ownership is in anywise an ingredient in the offense of trading with slaves. But being alleged it is necessary that they should be satisfactorily proved.

Error to Madison circuit court. HENRY, J.

The plaintiff in error was indicted under the law approved March 6th, 1850, entitled, "An act to suppress trade and barter with slaves, and for other purposes." The indictment was found at the October term of the court below, 1854, and avers, "that Daniel W. Murphy, late of the county aforesaid, yeoman, on the 18th day of April, A. D., 1854, with force and arms at the county aforesaid, unlawfully, did then and there sell spirituous liquors, namely, whisky, rum, gin and brandy, to a certain slave named Allen, owned by Robert Love, without the consent in writing of the master, owner, overseer, employer or mistress of said slave, contrary to the form of the statute," etc.

The case was called for trial on the 17th of October, 1854, and the prisoner pleaded not guilty, and was put upon his trial. Thereupon the district attorney called as a witness, Henry R. Coulter, the prosecutor, and marked as such on the back of the indictment, who being sworn, the district attorney propounded a question to him, as to his knowledge of the charge in the indictment; defendant objected to the answering of said question by said Coulter, and to said Coulter's competency as a witness in the cause on account of the direct interest which said Coulter had in the result of said prosecution, the statute directing that one half of all the fines collected under the provisions of said act should be paid to the prosecutor. The court overruled this objection, and allowed the prosecutor to testify in the cause. To this ruling of the court defendant excepted. Witness then proceeded to state, that on the morning of April 18th, 1854, he was standing about three hundred feet from Murphy's store, when he saw a mule-team wagon of Judge Robert Love, loaded with

cotton, stop near him, with its driver, whom he thought was Judge Love's Frank, but who, he learned afterwards from Judge Love, that it was Allen, whom he knew was a slave of Judge Love; the wagon stopped near where witness was standing; the driver of the wagon took out of the wagon a bottle without a stopper, and witness tried to take it from him, but failed to do so; said driver jerked away from him, and went with his bottle into the house of said defendant's store; witness saw said driver enter the front door of said Murphy's said store, and after being there for some time, the said driver returned to his wagon with a bottle under his coat, and put the bottle back into the wagon. Witness proceeded to the wagon, took out the said bottle, and found whisky in it, which witness thought was the same bottle the driver had taken away with him.

Judge Robert Love, a witness for the state, testified, that he had and owned a mule-team wagon, and a driver named Allen, on the 18th day of April, 1854, and that said driver was engaged in hauling cotton about that time.

The defendant offered to prove by John B. Hemphill, the district attorney, who was in attendance on the grand jury which found and presented said indictment, that Henry R. Coulter, prosecutor, was the sole witness before the grand jury, and on whose testimony alone said bill of indictment was found; but the court ruled said proof to be illegal, and would not allow said Hemphill to answer said question or to be sworn in the cause for that purpose, to which ruling of the court, defendant excepted. Defendant did not introduce any evidence to the jury.

The following instructions were asked by the defendant and refused by the court:

2d. "The indictment charging the offense to be that the defendant did unlawfully sell spirituous liquors, namely, whisky, rum, gin and brandy, unless the jury believe from the evidence that the defendant did sell rum, whisky, gin and brandy, the law is for the defendant, and they will find him not guilty." This instruction was modified and amended by the court as follows: "But if the slave came out with spirituous liquor which he did not take in, the defendant's knowledge is presumed."

4th. "Even if the jury should be satisfied that the slave got

whisky out of defendant's house, yet, unless the jury believe from the evidence that defendant knew of his so getting the whisky, the law is for the defendant, and the jury will find the defendant not guilty." To the refusal of this instruction, and the modification of the court of the second instruction, defendant excepted.

The jury returned a verdict of guilty. Defendant below moved in arrest of judgment, because there was no valid law or statute to found a judgment upon under a verdict rendered with such testimony and instructions. The court overruled the motion in arrest of judgment, and the defendant excepted. The defendant then made a motion for a new trial, because; 1, the jury found contrary to the law and evidence; 2, because the court erred in refusing defendant's instructions; 3, because the court erred in allowing the prosecutor to be a witness, he having a direct interest in the result of the prosecution, as regulated by sec. 5, of the law of 1850; 4, because the court refused to let the district attorney answer the question whether Henry R. Coulter, the prosecutor, was not the only witness sworn before the grand jury, and upon whose testimony the indictment was found. Which motion for a new trial the court overruled; and the defendant having embodied the testimony in his bill of exceptions tendered the same to the action of the court in overruling said motion, and the same was signed, sealed, and enrolled, according to the statute.

*Franklin Smith*, for plaintiff in error.

The defendant was modest enough not to ask that the jury must be satisfied before they could convict, or that the defendant did sell the commodity, or was present when it was sold; but he was content to ask that unless they were satisfied from the evidence that defendant knew of the commission of the offense, they must find for the defendant. But the court charged in this case (in which there is not a scintilla of proof that the defendant was in the store at the time, or where he was), that the presumption was that he knew of the negro getting the commodity which he had in his hands when he came out of the store, and that he got it in his store. History reads some sad lessons to the judicial mind as to what Draconic laws have been put upon the

statute book to enforce some supposed "necessity" of "state" (the tyrant's plea), or to sacrifice, in its diseased condition, to popular odium, some of its supposed enemies, and to punish even the innocent to get at the guilty, on that same "tyrant's plea of necessity." But the just judge of all ages has defied alike the depraved mandates of the excited populace, and the cruel behests of the tyrant, and vindicated the august position of God; asks only, what is law, and here in America, especially, what says the written constitution?

That the legislature has gone too far in sec. 3 of the laws of 1850, pp. 101, 102, we think that even a slight investigation of first principles will show. In every age and country of the civilized world, where the common law has been known, its humane maxims that crime "must be fully proved," and that "every person is presumed to be innocent until he is proved guilty," are household words, known to the tyro and the citizen, as well as to the wisest of the bar—incorporated into jurisprudence, interwoven into the very net-work of society—truths as startling to deny, next to the denial of a future state of rewards and punishments, and of the soul's accountability to God. Early and late, at the first dawn of legal science, in the reigns of the worst Tudors and Stuarts, before the American revolution and since, up to the last page put to press by the last author—these truths of the common law of England and America have never been doubted or called into question in the countries named until the passage of the law of 1850 in this ultra republican state of Mississippi. See Wills on Circumstantial Ev., 120, 121, 145; 3 Greenl. Ev., 29, 30. Where has a contrary opinion prevailed? In countries of the civil law? In countries of extorted confessions by thumb-screws and the rack, the iron boot and the boiling lead—places where the poor wretch is presumed guilty, and on that presumption is tortured until he confesses; in the dungeon of the bastile, and in the tyrant's state prison, "where hope never comes that comes to all." It was in one instance made to sully the pages of the statute law of old England, but it was driven from it in disgrace, amid the execrations of all honest men. It was that horrid law, which makes the blood curdle in the veins at its recital, which presumed the mother of an ille-

gitimate child, when it died, guilty of infanticide, unless she could prove by one witness at least, that the child was born dead. Wills on Circumstantial Evidence, 125. The crying injustice of condemning men in advance, of holding them guilty unless they proved themselves innocent, has been immortalized by Virgil, where he makes the common sybil lead his hero through his fabled hell. On his way to the Elysian plain, the horrid sounds of Tartarus, surrounded by a triple wall, salute his ears; the clank of iron, the rattling of chains, the groans of anguish, the reverberations of the lash! Affrighted, he asks of his conductress, the meaning of those sounds, who the culprits, by what manner of punishments afflicted? The sybil replies, that "no pure spirit can ever enter those accursed abodes. There the Cretan Rhadamanthus holds his dreadful courts—he first punishes, and then hears the crimes, compelling the prisoner to confess," etc.

"Nulli fas casto sceleratum insistere limen. . .
Gnossius hæc Rhadamanthus habet durissima regna
Castigatque auditque dolos; subigitque fateri," etc.
—[6th Ænead.

Now, what does this law of 1850, sec. 3. ch. 31, pp. 101, 102, do, but pursue the Rhadamanthian system? If a negro (in a county where two-thirds of the population are such) is seen going into a store and come out with an article which he might have purchased in it, the owner of the store is presumed guilty, and will be thrown into prison until he proves himself innocent; and that he may never be able to do this, the district attorney is allowed to select any day in three hundred and sixty-five, to prove that a negro was seen going into a store and come out.

Is this according to the republican system established by our constitution? We think not. Among the sacred rights guaranteed in the declaration of rights in this state which, in the conclusion of that declaration, are "excepted out of the general powers of government, and shall for ever remain inviolate," is the right by sec. 10, to demand "the nature and cause of the accusation," "to be confronted by the witnesses against him," to have compulsory process for witness in his favor, and in all prosecutions by indictment or information, a speedy and "public

trial by an impartial jury," of the county where the offense was committed; nor can he be deprived of his life, liberty, or property, " but by due course of law."   Sec. 3, of the law of 1850, ch. 31, pp. 101, 102, does not confront a man with the witnesses against him; it condemns him without any witness; it does not give him a trial; the question of his guilt is not before the jury (as in other cases to be tried by them), on the evidence adduced; but he is already pronounced guilty before the trial begins.   He is deprived of his liberty on each charge, from one to twelve months (see sec. 1, ch. 31, Laws of 1850, p. 100), not by due course of law; for due course of law, at the time the constitution was framed, required that "crime should be fully proved," and not presumed.   These views are susceptible of the clearest demonstration, by authority as well as reason.   The number proper to constitute the tribunal called "jury" is nowhere defined in our constitution, and yet it is a term susceptible of the clearest definition, by reason of the common law when the constitution was adopted.   To dispense with the necessity of proof is just as great a stretch of power as would be the legislative dispensing with the number of twelve men on the jury; and we have authority for saying that, if the legislature were to prescribe as a jury a less number than twelve men, the law would be unconstitutional.   Byrd v. State, 1 How., 177; 1 Tuck. Black., 60; 1 Thomas' Coke, 8.

The counsel for the prisoner requested in the court below, that the jury might know that the defendant must have had some knowledge of the offense to make him guilty.   Even in the trial of the mob cases in 1780, Erskine took as the foundation of the defense of the deranged Lord George Gordon the maxim of the law for ages, the maxim of reason and of common sense, "*Actus reum non facit nisi mens sit rea.*"   This maxim is nullified under this law.   It is not only the keeper of the store that is to be punished, but, as in this case, the owner of the store. Now, the presumption of law is, that the owner would not violate the law; that he carries on an honest traffic; that, as retailing was not allowed, if the negro got any thing in the store, he must have got it (by watching his opportunity when the owner was absent) from some other person present.   Under this

law, though the defendant might have been asleep in another house, or he might have been otherwise absent from his store, so that it would be impossible to have presumed his presence; yet, unless he can prove that he was so absent on the particular day selected by the district attorney, he is made guilty of an offense which is itself presumed, and loses his liberty. It ought to be proved that he was present, that the deed was done, that he did it, that he was present when another did it, or at least that he knew of the crime and did not prevent it, but directly, indirectly, or tacitly connived at it. Unless these positions be correct, what becomes of the first principle of the law? " *Nemo punitur pro alieno delicto.*" " *Nemo punitur sine injuria facto seu defalto.*" 2 Co. Inst., 287. In such way is a man to be punished by due course of law, for his own offenses proved and established; and until proved and established he is to be presumed innocent. No man can be said to have "a trial" of his case when he is already condemned without the production of a particle of proof to fix a crime upon him. Under this sec. 3, he has not a trial under the law on evidence, but remote facts only are proved from which the crime is to be presumed. And then a presumption is raised on that presumption that he did it, and his trial thus becomes a mockery, because in violation of the first principles of a fair " trial." He is not to be proved guilty, but he is to be taken as guilty in the outset, on the presumption of a crime being committed; and secondly, on the presumption that the prisoner did it, in outrage of the due course of law, which presumes him innocent until proved guilty. By section twenty-eight of the declaration of rights, " the right of trial by jury shall remain inviolate;" under the instructions founded on this law the jury being compelled to presume every thing against the prisoner, he has no more opportunity to be tried by jury than if the jury had been abolished. The law had as well have said, if a negro be seen going down the street, all persons there inhabiting must prove themselves innocent, or else they shall be presumed guilty. The fact of the negro going into a store is a perfectly innocent act; but as the negro was found with a commodity coming out, it is not to be presumed that he got the commodity himself, or got it from some person other than the

defendant, but a crime is to be presumed, and the owner to be presumed the guilty agent.  The innocent act is established, it is undoubted, it is undisputed; the consequences of guilt are not found by the jury on the evidence, but are found fastened by the law.  Such proceeding is palpably unconstitutional, and has been pronounced so in similar cases by this court.  Smith's Admr. v. Smith, 1 How., 102–105.  The trial by jury must remain inviolate, and the party cannot be deprived of his liberty, only by due course of law.  Flournoy v. Smith et al., 3 How., 62–65.  The ablest courts will not allow constitutional rights to be frittered away by ingenious sophistries, but will adhere to the plain letter and the meaning attached thereto when the constitution was framed.  Thompson v. Grand Gulf Railroad and Banking Co., 3 How., 247–250; Marbury v. Madison, 1 Cranch., 137 ; 1 S. C. U. S. Condensed Reports, 267, 284, 285.

The fearful consequences of declaring a state law unconstitutional were hurled at Chief Justice Marshall with great fierceness by a daring man, in the case of Craig et al. v. State of Missouri, 4 Peters, 410, 438.  But the venerable and upright judge, in declaring the law unconstitutional, mildly replied to all the "sound and fury" about the consequences of the court's so doing, "These are considerations which address themselves to those departments which may with perfect propriety be influenced by them."  "This department can listen only to the mandates of law, and can tread only that path which is marked out by duty." 4 Peters, 438. In Craig v. State of Missouri, a man was most unconscionably seeking to take advantage of an unconstitutional law.  The person may be vile; the principles to be struck down on his account may be sacred and of incalculable value to all the citizens as a community; and the only question for a just court is, What are the mandates of (constitutional) law?  What is the path marked out by duty?  Whenever the legislature is to look to who are good or bad citizens, apart from the crime itself, and make that apply to particulars which will not admit of universal enforcement, our liberties are at an end.  In many respects this is an infamous, iniquitous, tyrannical law, worthy of the worst days of the Stuarts and of the worst of the judges.  A rigid enforcement

of this would sweep it from the statute book in six days after the legislature met. . .

Section three of the act is unconstitutional, because it makes a difference between the man whose store is also his dwelling-house and the man who has his store separate from his house. In the latter case the dwelling is the owner's castle and is respected; crime is not presumed against its inmates. The offense has to be made out under the first section of the act as in other criminal cases, by being "fully proved." In the case of a person who has a dwelling and store in the same house, it is made a crime against him for a particular class of persons to be seen entering his house, though such persons are the lawful inmates of every dwelling-house in the state. A difference is set up between different classes of citizens; against one set crime has to be "fully proved;" towards the other set, crime may be presumed against the person charged, on the presumption that a crime has been done by somebody. This difference between classes of citizens falls directly under the condemnation of the declaration of rights, and is scouted with reprobation by the solemn adjudications of this court. Smith's Admr. v. Smith, 1 How., 102–105. Striking at bad citizens may do for tyrants and their tools, but pure and enlightened courts never allow the constitutional rights of freemen to be crushed away on any such plea.

John Wilkes, a member of the British house of commons, was a man of very bad private character (had he been a man of good character, Dr. Johnson says, he would have dethroned George III.); he was sent to the tower under the warrant of the secretary of state. He demanded of the court of King's bench, through his counsel, his liberty by writ of *habeas corpus*, on the ground that the publication of a libel (which was the offense alleged) was not a breach of the peace, and that the privilege of parliament exempted him in all cases except in treason, felony, and breach of the peace. The state was in a diseased condition at the time (1763), and the necessity of enforcing the law was very great. But the able judges of the King's bench looked only to the cause without regard to persons, and based their unanimous decision on the constitutional rights of the citizen, as if the

purest man in the kingdom stood there before them.   Chief Justice Pratt delivered the opinion of the court, and said in the conclusion of the opinion, " I cannot find that a libeller is bound to find surety of the peace, nor ever was in any case except one, namely, the case of seven bishops, where the judges said that surety of the peace was required in the case of a libel ; Judge Powell, the only honest man of the four judges, dissented, and I am bold to be of his opinion, that case is not law ; but it shows the miserable condition of the state at that time ; upon the whole it is absurd to require surety of the peace or bail, in the case of a libeller, and, therefore, Mr. Wilkes must be discharged from his imprisonment." The King v. Wilkes, 2 Wilson R., 160.

In the case of the State v. Borgman, reported in a note to 2 Nott & McCord R., 34–37, the views herein taken will be found in the main sustained, especially as to the constitutional necessity of connecting by proof the defendant with the crime, either by proving that the defendant participated in, or did the act, or was present when it was done, or tacitly approved of, or instigated it by his recognition of the act in permitting another habitually to do it in his employment, with his knowledge.

In this case, it is not proved that the defendant was in his store, knew of the crime, or that he had a clerk or negro through whom he transacted his business.

It is evident from the proof that the district attorney designed to punish the defendant by aid and through the rigor of section three, as the keeper or owner of a storehouse. But as it has been said of persons designing certain bequests in a will, and failing to express their wish *voluit sed non dicit*, so it may be said here of the district attorney, *voluit sed non fecit*. The word storehouse nowhere appears in the indictment, nor any thing like it. The statutory, indispensable words, " or keeper or owner of such storehouse," nowhere appear.   The presumptions of section three can be of no service against any one except against persons " owning or keeping a storehouse, warehouse, tippling-shop, or other place fitted up or kept for trading." § 3, p. 101.   It is only against " a person owning or keeping such storehouse," etc., that the going in and coming out of a negro with something he might

have purchased therein, is " presumptive evidence" of guilt. § 3, p. 102.

No matter what the proof was in this cause, yet to bring the party within the purview of the provisions of section three, it is altogether essential that the language of the statute " creating the offense," should have been pursued. The court charged on section three ; the case was pressed under section three by the state, and the proof was made to fit section three. Yet it is very evident from the averments of the indictment, that the presumptions of section three were all illegally applied, and to have had advantage of " presumptive evidence " against the defendant, it should have charged that the defendant was the owner or keeper of a certain storehouse, and that the slave did bring out of such storehouse a certain commodity, which said defendant sold to said slave in said storehouse, without permission, etc., *contra formam*, etc., etc., so that the court might see that the proof sustained the charge, and that judgment and punishment were applied where the law prescribed, and to do this there must appear on the record the offense charged in the language of the statute. 1 Chitty Cr. Law, 168, 169, 171, 281–283 ; Anthony v. State, 13 S. & M., 264, 265 ; Starkie Cr. Pl., 252, 253.

From the averments in the indictment, the court is constrained by the rules of criminal pleading, and the benefits of a fair trial, as provided in the authorities last referred to, to make the case fall under section first, and not under section three. Murphy's house is not averred to be " a storehouse ;" the defendant is not averred to have been keeping or owning such storehouse at the time of the commission of the offense. Is the testimony, then, sufficient in this case to convict any citizen in the state independent of all considerations of his being " a storehouse owner or a shop-keeper ?"

*D. C. Glenn*, attorney general.

1. The law under which the indictment in this case was found is a stringent police regulation, it is true, to preserve a peculiar class of our population, and when once promulgated is as binding as any other law. The court silently ignore this objection to this law in 24 Miss. R., 590.

2. When it is plain the infliction of a fine or penalty is intended as punishment in furtherance of public justice, rather than as an indemnity to the party injured, or to secure a mere pecuniary benefit to the prosecutor, and that the detection and conviction of the offender are the objects of the legislature, the case will be within the exception, and the person benefited by the conviction, will, notwithstanding his interest, be competent. 1 Greenl. Ev., 412 ; 3 McLain, 53, 299 ; 16 Peters, 203 ; 1 Bald., 90 ; 9 Barn. & Cress., 556.

SMITH, C. J. :

The plaintiff in error was indicted and convicted under the act of the 6th of March, 1850, " to suppress trade and barter with slaves."

Several exceptions are now urged to the validity of the judgment.

1. It is insisted that the court below erred in overruling the motion in arrest of judgment. The reason assigned in support of that motion, denies the constitutionality of the act, under which the indictment was framed.

The same objection was made in Murphy v. The State, 24 Miss. R., 590. In that case, the question arose on a motion to quash the indictment, which was framed under the same statute. On that occasion, this court entertained no doubt of the constitutional power of the legislature to declare that it would be criminal to commit any of the acts enumerated in the first section of the statute, and consequently to provide for the punishment of the offenders in the mode provided. It was held, also, that indictments for the offenses defined in the first section, " framed in the general manner indicated in the second section," would be invalid, inasmuch as an indictment thus framed, and which would consequently contain no allegation of the character or quantity of the produce alleged to have been sold or received, nor of the name of the slave with whom the illegal traffic was had, nor of the name of the owner of such slave, would violate the right secured by the tenth section of the bill of rights to the accused, to demand the " nature and cause of the accusation against him."

In the case at bar, the date of the offense, the character of the commodity, the name of the slave and his owner are alleged in the indictment. There can, therefore, be no doubt, under the previous decisions of this court, that the motion in arrest of judgment was properly overruled.

2. On the trial, Henry R. Coulter, the prosecutor, whose name was endorsed on the indictment, was offered as a witness for the prosecution. His examination was objected to by the defendant on the ground that he was interested in the event of the suit. The objection was overruled, and the defendant excepted. The competency of this witness is the next question for our consideration.

The first section of the act, under which the plaintiff in error was convicted, provides, that upon the conviction for any of the offenses therein defined, the party convicted " shall be fined in a sum not less than fifty dollars, nor more than five hundred dollars." The fifth section directs that " one half of all the fines collected under the provisions of this act, shall be paid to the prosecutor, and the other half to be appropriated to the common school fund of the county."

It is very manifest, under these provisions, that the witness examined on the trial below, had a direct interest in the result of the prosecution. The question arising here is: Did that interest render him incompetent as a witness for the prosecution?

It is unquestionably true, as a general rule, in civil as well as in criminal cases, that a person interested in the event of a suit or prosecution, is not a competent witness. Thus, where a penalty is imposed by statute, and the whole or a part is given to the informer or prosecutor, who becomes entitled to it forthwith upon the conviction, he is not, at common law, a competent witness for the prosecution. Roscoe Cr. Ev., 126 ; Greenl. Ev., 472, § 403. But there are many recognized exceptions which are said to be as old as the rule itself. Thus, it is stated as a clear exception, that where a statute can receive no execution, unless a party interested be a witness, then he must be allowed. This exception to the general rule is based upon the presumption, that the rules of the common law are laid aside by the statute, that it may have effect, which would be otherwise wholly de-

feated. Gilbert Ev., 114. So cases of necessity, where no other evidence can be reasonably expected, have been from the earliest periods recognized as another exception. Thus, for example, in prosecutions for robbery, the person robbed is a competent witness for the prosecution, although he will, upon conviction of the offender, be entitled to a restitution of his goods. Greenl. Ev., 480, § 412. Another exception is that of a person who is to receive a reward for or upon the conviction of the offender. A person thus situated, is universally recognized as a competent witness, whether the reward be offered by the public or by private persons. " The case of a reward (says Mr. Justice Bayley) is clear on the grounds of public policy, with a view to the public interest; and because of the principles upon which such rewards are given. The public has an interest in the suppression of crime, and the conviction of criminals. It is with a view to stir up greater vigilance in apprehending, that rewards are given; and it would defeat the object of the legislature by means of those rewards to narrow the means of conviction, and to exclude testimony which would be otherwise admissible." Rex v. Williams, 17 Com. Law R., 440.

Where a penalty, given by statute, is recoverable on the indictment itself, so that the person entitled to the penalty is not driven to a suit, his title thereto gives such an interest as will render him incompetent as a witness. But if the act by which the penalty is given to the informer, prosecutor, or other person, contemplates his being a witness, his competency is of course continued; and it is clear, that it is not necessary there should be an express legislative declaration to that effect, but that the court may infer such intention from the language of the statute or its professed objects. Cases of this description are recognized as another exception to the rule at common law. Murphy v. United States, 16 Peters R., 211; Rex v. Trasdale, 3 Esp. R., 68; Howard v. Shipley, 4 East R., 180.

It is insisted in behalf of the state, that the case at bar falls within the principle of this last exception; that there has been, although no express words to that effect are contained in the statute, " a legislative capacitation given" to the prosecutor.

In Rex v. Williams, it was said by Mr. Justice Bayley, " Where

it is plain that the detection and conviction of the offender are
the objects of the legislature, the case will be within the excep-
tion, and the person benefited by the conviction will, notwith-
standing his interest, be competent." This language was quoted
with entire approbation by Judge Story in Murphy v. The Uni-
ted States; and the rule is laid down in almost the same terms
in Greenleaf's Evidence, 480, § 12.

It is very manifest, if this rule is to determine the question
under consideration, that the prosecutor, notwithstanding he had
a direct and certain interest in the event of the prosecution, was
a competent witness. For it cannot be doubted, that the detec-
tion and conviction of offenders were the objects of the legisla-
ture, and not the private benefit of the prosecutor. But, if this
rule is applied as the test of the competency of persons
who are to be benefited by the conviction of offenders, there is
no case in which a person, having a direct and certain interest
in the event of the prosecution, unless rendered incompetent by
express legislative declaration, would not be competent. For
the manifest reason, that the presumption is not to be entertained,
that the legislature would create an offense and impose a penalty
with any other view than the public good, or that the penalty
would be given to the informer or prosecutor for any other pur-
pose than that of promoting the detection and conviction of
offenders. The rule, as laid down in Rex v. Bayley, does not
appear to be sustained by the cases cited in the opinion of the
court, and is not defensible upon principle. And although it
has received the approval of some high authorities in this coun-
try, we are not prepared to give it our sanction; as it is evident
that its recognition and application would effectually annul the
unquestioned principle of the common law, that where the pen-
alty is recoverable on the indictment itself, and the informer or
prosecutor is not driven to a suit, he is, in consequence of his
title to the penalty, rendered incompetent as a witness.

The question then is: Can it be implied, from the particular
provisions and policy of the act, that the legislature intended to
make the prosecutor a competent witness in prosecutions for
offenses under the act?

The statute against bribery, 2 Geo. II., ch. 24, § 8, provided,

that any offender against the act discovering, within a certain time, any other offender within the act, so that the person so discovered be thereupon convicted, the discoverer not having been before the time himself convicted of the offense, shall be indemnified and discharged of all penalties and disabilities incurred under the act; that is, he should have the benefit of using the verdict against the other offender for his own indemnity. Under the particular provisions and policy of that statute, it was held, that the discoverer was a competent witness for the plaintiff· in an action for the recovery of the penalty imposed by the act. In the language of Lord Ellenborough, " a parliamentary capacitation was given to the witness through whom the fact is discovered, and who might otherwise at common law have been incapacitated." Howard v. Shipley, 4 East R., 180. In Rex v. Trasdale, which was an indictment on the 21 Geo. III., ch. 37, § 1, for exporting machines used in the manufactures of that country. By the statute, the offender, upon conviction, was to forfeit the machines, etc., and also £200. The forfeitures, where not otherwise provided, were to go to the informer. The· informer was called as a witness, and objected to on the ground of interest. The objection was overruled by Lord Kenyon, who considered the term "informer" in 21 Geo. III., as equivalent to the term "person discovering" in 2 Geo. II., ch. 24, § 8; and as it had been decided, that the legislature must have intended, that the person designated as the "person discovering" in the one case should be a witness, it must be taken it had the same intention as to the person designated by the word "informer" in the other. 3 Esp. R., 68; 17 Com. L. R., 448. Both of these cases were cases of secrecy, and the detection and punishment of the violators of these statutes deemed of great importance to the public. The terms "discoverer" and "informer," as employed in the English statutes, implied a personal knowledge of the criminal act sought to be detected and punished. Hence, the courts were doubtless justified in holding, that the witnesses were made competent by a parliamentary declaration; for, if the witnesses offered on those occasions had been excluded on the ground of their interest in the event of the prosecution, the provision would have been rendered nugatory and useless.

It would have been holding out inducements to persons to discover offenses committed in violation of the statute, and to inform upon the offenders, when, by the operation of the common law rule, the discoverer and informer would be excluded from the rewards proffered by the statutes themselves.

But, it is insisted, that the term "prosecutor" does not generally and necessarily imply a knowledge of the criminal act charged in the indictment; hence, that the rule laid down in the English cases above cited ought not to be applied to the case at bar.

The illicit traffic with slaves is an evil, in this community, of great magnitude. Acts in violation of the statute on the subject are committed in secret, generally at night, and always in the absence of the owner of the slave, who is the person most seriously affected. The history of the legislation on this subject, and of the criminal jurisprudence, furnish unmistakable evidence of the difficulty encountered in the detection and punishment of offenders under the existing laws. The consequent impunity with which illegal trading with slaves was carried on, not less than its ruinous consequences, led to the adoption of the statute, remarkable for its stringent provisions, under which this indictment was framed. Whilst, therefore, it may be conceded, that the prosecutor is not presumed, necessarily, to have a personal knowledge of the offense charged, and hence, that the term is not used in our statute in a sense equivalent to the term "discoverer," as employed in the English statute against bribery, nevertheless we cannot doubt, from our view of the particular provisions and policy of the statute, that they amount to a legislative declaration, that the person prosecuting for an offense, under the act, may be a witness against the party charged. A different construction, instead of advancing the objects of the act, would narrow the means of the detection and punishment of offenders, by taking away the inducement held out by the legislature, with the view of stirring up greater vigilance, in bringing them to justice; for it is manifest, if the expectation of sharing the penalty consequent upon conviction is the operative motive with the prosecutor, and the provision is based upon that supposition, it is unreasonable and illogical to expect that

any person would act the part of an informer or prosecutor, without hope of being remunerated. For that reason, as well as from the character of the offense, and the secrecy with which it may always be committed, it is greatly to be apprehended, if the prosecutor should be excluded as a witness, that the statute itself will fail of any beneficial execution. We feel fully justified, therefore, in holding that the objection to the competency of the witness was properly overruled.

3. The court was requested by the defendant to charge the jury, " that unless they believed from the evidence, that the defendant did sell whisky, gin, rum, and brandy, the law is for the defendant, and the jury will acquit him." The refusal of the court to give this charge is excepted to. The indictment charged the illegal sale of whisky, gin, rum, and brandy to a slave.

The general rule is, that every material averment in the indictment must be proved; but it is generally unnecessary to prove the offense to the whole extent charged. It is invariably sufficient to prove so much of the indictment as shows that the defendant has committed a substantive crime therein specified. Rex v. Hunt, 2 Camp. R., 585 ; Swinney v. The State, 8 S. & M., 576. Proof, therefore, that either whisky, gin, rum, or brandy was sold to the slave by defendant, would have authorized a conviction. There was, hence, no error in withholding the instruction.

4. The court was further asked to charge that "even if the jury were satisfied that the slave got whisky out of defendant's house, yet, unless the jury believe from the evidence, that defendant knew of his getting the whisky, the law is for the defendant, and the jury will find the defendant not guilty."

This instruction was given, qualified by adding to it the following words: " But if the slave came out with spirituous liquor, which he did not take into the defendant's house, the defendant's knowledge is presumed."

The charge, as modified, was correct. It is in strict accordance with the fifth clause of the third section of the act; which, upon the proof before the jury, raised the presumption of the defendant's guilt, as charged in the indictment, upon the proof made, that the slave obtained the whisky from the store of the

defendant. If the ownership of the slave was sufficiently established, the jury, in the absence of all opposing testimony were bound to convict, unless the provisions of the third section of the act are void. In our opinion they are not so. Those provisions may be extremely unwise and impolitic. They are certainly rigorous and harsh; but we are not prepared to say with counsel, that the legislature, in the enactment of them, transcended their constitutional authority.

5. It is, in the last place, objected that the court erred in overruling the motion for a new trial.

According to the rule of evidence laid down by the third section, the proof was complete of the commission of an offense, when it was shown by the testimony that a slave had obtained the whisky from the store of the defendant. Neither the identity of the slave nor his ownership was in anywise an ingredient in the offense for which the defendant was indicted. But, being alleged, it was necessary that they should be satisfactorily proved. It is clear, however, that the same strictness is not required in the proof of an averment of that character, which is requisite in the establishment of the *corpus delicti*, except in cases where the subject of the averment is a record or a written agreement. Applying this rule, we think the verdict ought not to be disturbed.

Let the judgment be affirmed.

HANDY, J., concurred.

FISHER, J., dissenting:

It is admitted that the prosecutor, according to the rules of the common law, was an incompetent witness against the accused. The question, then, arises: How has the prosecutor been rendered competent? The majority of the court say, by the statute. But the statute is entirely silent on the subject. The word "prosecutor" occurring but once in it, and then so as to disqualify him as a witness.

It is the right of every person put upon his trial for the alleged commission of a criminal offense, that none but competent witnesses should be introduced against him. This is a right secured by the common law, and a statute which attempts to abridge or interfere with such right, must receive a strict con-

struction, by which is understood a construction according to its letter. But if it be entirely silent in this respect, there is nothing to construe, and the statute does not, of course, speak at all on the subject.

The same may be said in regard to penal statutes, or statutes which create offenses. They must be strictly construed; that is to say, they must not be extended by implication beyond the "legitimate import" of the words used, so as to embrace cases not clearly described by such words.

Remedial statutes may receive a liberal, or, in other words, an equitable construction, by which the letter of the act "is sometimes restrained and sometimes enlarged, so as more effectually to meet the beneficial end in view, and prevent a failure of the remedy." And hence, it is often said, that such a case, though not embraced by the letter, is nevertheless embraced by the equity of a particular statute. A remedial statute may, therefore, speak both by its words and by its equity. But a penal statute, having no equity, can, of course, speak only by its words, and if they are not in such statute, it does not speak at all on the subject, and hence the rule of the common law, whatever it is, remains unchanged.

My opinion, therefore, is that the witness should have been excluded.